# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS FRUNGILLO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv-108 |
| v. | ) | |
| | ) | |
| BRADFORD REGIONAL AIRPORT | ) | |
| OPERATING, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Thomas Frungillo filed this civil action after being terminated from his position as the Director of the Bradford Regional Airport. At this point in the litigation, Plaintiff's only remaining claims involve alleged violations of the Pennsylvania Human Relations Act ("PHRA") by his former employer, the Bradford Regional Airport Authority (at times hereafter, the "Airport Authority" or "Authority" or "Defendant").[1] The Court has subject matter jurisdiction over the remaining claims pursuant to 28 U.S.C. §1332.

Pending before the Court is the Authority's renewed motion for summary judgment relative to the PHRA claims. ECF No. 82. For the reasons set forth below, the motion will be denied.

---

[1] Plaintiff has also named as Defendants "Bradford Regional Airport Operating" and the Bradford Airport Advisory Board. Technically, his PHRA claims against these Defendants remain pending; however, neither one is an entity capable of being sued. Bradford Regional Airport Operating is simply a bank account through which all expenses of the Airport Authority are paid; it does not exist as an independent legal entity. See ECF No. 46, ¶¶ 2-3; ECF No. 54, ¶¶2-3. The Bradford Airport Advisory Board also does not exist as a legal entity; it does not conduct business, possess assets, or employ staff. ECF No. 46, ¶4; ECF No. 54, ¶4. Accordingly, Plaintiff's claims against these Defendants will be dismissed, and the Court will evaluate the merits of Defendants' motion for summary judgment only as it relates to the Airport Authority.

# I.    Factual Background[2]

### A.  The Parties

The Airport Authority was incorporated in 1967 by four counties (Cameron, Elk, McKean, and Warren), pursuant to the Municipal Authorities Act of 1947. DCSMF ¶5. Its purpose is to oversee operations at the Bradford Regional Airport ("Airport"), located in McKean County. DCSMF ¶ 7. To that end, the Authority operates under the control of a nine-member Board of Directors (at times hereafter, the "Board"). Id. ¶8.

During the time period at issue in this case, the Board was comprised of: Joseph DeMott ("DeMott"), Robert Huber ("Huber"), Fred Fesenmyer ("Fesenmyer"), Barbara Cummings ("Cummings"), Ron Dankesreiter ("Ron Dankesreiter"), Ken Kane ("Kane"), John Satterwhite ("Satterwhite"), Max Brady ("Brady"), and Dan Freeburg ("Freeburg"). DCSMF ¶¶35, 42, 52, 71. DeMott was the Board's Chairman. By virtue of that position, he was also the Authority's CEO and directly oversaw the Airport's management team, including the position of Airport Director. PCSMF ¶¶39-42. DeMott was also a member of the Authority's Personnel Committee, along with Huber, Fesenmyer, and non-Board Member Mike Glesk ("Glesk"). Id. ¶42.

The Authority hired Plaintiff as Airport Director in 1998. DCSMF ¶13. In this position, Plaintiff was responsible for the day-to-day operations of the Airport. DCSMF ¶18. Over the

---

[2] The following facts are derived from the Defendants' Concise Statement of Material Facts in Support of Motion for Summary Judgment, ECF No. 46, and Plaintiff's response thereto, ECF No. 54 (collectively, "DCSMF"), as well as Plaintiff's Omnibus Counter Statement of Material & Disputed Facts, ECF Nos. 52-1 and 55-2, and Defendants' responses thereto, ECF No. 58 (collectively, "PCSMF"). Where relevant, the Court has also drawn from undisputed portions of the evidentiary record. Unless otherwise indicated, the following facts are not contested. To the extent the facts are contested, the Court construes them in the light most favorable to Plaintiff. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

course of his 16-year tenure as Airport Director, Plaintiff never received any discipline up until the time of his discharge. PCSMF ¶6.

B. *Plaintiff's Health Issues*

At times relevant to this litigation, Plaintiff suffered from degenerative disc disease in his lower back, a bulging disc in his neck, and nerve damage to his arm. PCSMF ¶¶56-57. His medical treatment notes reflect a history of these ailments, which resulted in back pain, sciatica, difficulty sitting for extended periods, difficulty driving, and difficulty bending and leaning over in certain situations. PCSMF ¶¶ 58-63. According to Plaintiff, his back and neck pain interfered with his ability to concentrate when working on his computer. PCSMF ¶64. Plaintiff also experienced sleep interruptions from back pain that would occur when he moved in his sleep. PCSMF ¶65. In 2013, Plaintiff was diagnosed with anxiety, for which he was prescribed Zoloft. PCSMF ¶¶67-68. Plaintiff contends that the stress he experienced at work contributed to his problems with anxiety and exacerbated his back and neck pain.

To ameliorate his back and neck problems, Plaintiff utilized an ergonomic work chair, raised his computer screen to allow himself the option of standing, and sometimes sat on an exercise ball instead of a chair. Pl.'s Depo. at 78:2-5, 88:19-21, ECF No. 53-1. As Airport Director, Plaintiff was able to implement these accommodations on his own. *Id.* at 88:19-89:1. Although Plaintiff and his doctors discussed surgical options for repairing his bulging disc, Plaintiff considered surgery to be a last resort and opted instead to treat his pain through more conservative measures, including medication, exercises, acupuncture, and/or chiropractic treatment. *Id.* at 61:2-20, 66:1-22, 67:13-14, 68:13-20.

Plaintiff asserts that members of the Authority's Personnel Committee were aware of his back and neck problems during the course of his employment. He testified that one of the Committee members (either DeMott, Glesk, or Huber) asked about his raised computer screen; in response to the inquiry, Plaintiff explained that standing at his computer helped relieve his back pain. Pl.'s Depo. at 78:5-13, ECF No. 53-1. On another occasion, Plaintiff was present in DeMott's office and had a discussion with a third party, in DeMott's presence, about being in traction for his back condition. *Id.* at 78:20-79:14, 80:25-81:3.

*C. The Events Preceding Plaintiff's Discharge*

On or about August 23, 2014, various employees of the Authority attended a mandatory safety training session related to their employment. DCSMF ¶20. The training session resulted in several employees exceeding forty hours of work for that week. DCSMF ¶¶21-22. Because the employees in question were "non-exempt" under federal labor laws, they were entitled to overtime pay. *Id.*

Plaintiff was scheduled to be away from the office on a pre-planned vacation with his then-fiancée from August 30, 2014 through September 5, 2014. DCSMF ¶38. His last scheduled day of work prior to going on vacation was Friday, August 28, 2014. DCSMF ¶31.

On or around that day, the Authority's Office Manager, Alicia Dankesreiter ("Dankesreiter"),[3] presented Plaintiff with payroll checks for the previous workweek for his signature. DCSMF ¶23. The checks included overtime payments relative to the August 23, 2014 training. DCSMF ¶24. Plaintiff expressed uncertainty about whether overtime pay applied

---

[3] Alicia Dankesreiter is the daughter-in-law of Board member Ron Dankesreiter.

for the training hours at issue and refused to sign the checks. DCSMF ¶25. There is some disagreement between the parties as to what transpired next.

According to Defendants, Dankesreiter obtained an opinion letter from an auditor, who clarified that the Authority was legally obligated to pay overtime wages. DCSMF ¶26. After Dankesreiter presented the auditor's opinion to Plaintiff, he still refused to sign the paychecks. DCSMF ¶27. Later that same day, Plaintiff met with Dankesreiter and Maintenance Supervisor Norman O'Rourke and blamed them for improperly scheduling the training in a manner that resulted in overtime pay. DCSMF ¶¶28-29. Plaintiff allegedly stated during this meeting that, when he returned from vacation, either they or he would no longer be employed by the Authority. DCSMF ¶30. Plaintiff later left work that day without signing the checks. DCSMF ¶32.

Although Plaintiff does not dispute that he went on vacation without signing the checks, he maintains that he was awaiting a more definitive answer from the Authority before issuing the overtime pay. PCSMF ¶¶129-131. Plaintiff testified that he believed the more prudent course of action was to issue the employees their regular paychecks and settle the overtime issue upon his return. Pl.'s Depo. at 112:1-13, ECF No. 53-1. He notes that there were other individuals beside himself (including Board member Huber) who were authorized to sign the paychecks, so his absence would not necessarily preclude the Authority from issuing the checks. PCSMF ¶¶133-135; Pl.'s Depo. at 112:21-22. Plaintiff agrees that he met with Dankesreiter and O'Rourke on August 28 and blamed them for scheduling the training in a manner that unnecessarily created an overtime pay issue; however, he denies saying that either they or he would be gone upon his return. Pl. Dep. at 111:1-4; PCSMF ¶¶136-142.

5

In any event, Dankesreiter met with Huber the following Tuesday, September 2, 2014, to obtain his signature on the payroll checks. DCSMF ¶¶35-36. During their meeting, Dankesreiter informed Huber about the overtime incident and Plaintiff's refusal to sign the payroll checks prior to leaving for vacation. DCSMF ¶37.

On Monday, September 8, 2014, Plaintiff was due to return to work. Instead, he sent an email that same day to DeMott and the other members of the Personnel Committee, stating:

> I have over 20 days of vacation and need sometime [sic] off for my own personal health.
>
> There are personnel and support issues which need to be discussed prior to my return. I cannot simply continue as is.
>
> If you wish to discuss the matter further please let me know a date and time.

DCSMF ¶¶ 42, 44. In his response, DeMott stated:

> I suggest that you begin your vacation, relax and contemplate your future. I will get together with Rob, Fred, and Mike this week to discuss the situation. Then, we might meet sometime next week to discuss the matter.

DCSMF ¶45. Plaintiff then sent a reply indicating that he would take the remainder of the week as vacation and return to work the following Monday, September 15. DCSMF ¶46.

On September 8 or 9, 2014, after receiving DeMott's email advising him to "contemplate his future," Plaintiff contacted Glesk. Pl. Depo., at 130:21-131:13, ECF No. 53-1. Plaintiff informed Glesk that he wanted to discuss his health concerns with the Personnel Committee and inquired whether Glesk knew what the upcoming meeting was about. Id. at 131:7-9. Plaintiff claims that he told Glesk during this conversation that he was having "some real stress problems" and was taking Zoloft. Id. at 131:1-4. According to Plaintiff, Glesk replied, "[Y]ou don't want to be telling people you're on that Zoloft." Id. at 131:5-6; see also id. at 80:20-24.

Plaintiff ultimately agreed to meet with the Personnel Committee on September 12, 2014 to discuss his handling of the August 28, 2014 overtime dispute. DCSMF ¶58. Prior to Plaintiff's arrival, members of the Committee met at Fesenmyer's office to discuss the situation. Fesenmyer Depo. at 37:19-39:16, ECF No. 53-9. According to Fesenmyer, DeMott indicated to the other Committee members that he had spoken to Plaintiff about the September 8 email wherein Plaintiff had referenced his need for additional time off to address personal health concerns. *Id.* at 35:11-36:24. DeMott then advised the other Committee members that Plaintiff's health issues included "back issues" and "stress on the job." *Id.* at 36:17-24.[4]

---

[4] The Authority seeks to negate the above-cited portion of Fesenmyer's testimony based upon an errata sheet that Fesenmyer signed forty-five days after his deposition. In his errata, Fesenmyer states: "I do not recall whether I learned that Tom Frungillo viewed himself as having back issues and stress on the job during the meeting in my office on September 12, 2014 or at a later date." ECF No. 59-1 at 4. He explains that: "Upon further reflection, I likely learned that Tom Frungillo viewed himself as having back issues and stress on the job when I reviewed and discussed Mr. Frungillo's PHRC complaint, long after his termination." *Id.*

Federal Rule of Civil Procedure 30(e) provides a method whereby a deponent may correct his deposition testimony. *See* Fed. R. Civ. P. 30(e)(1)-(2). However, several "clear and mandatory" procedural requirements must be satisfied before changes may be permitted. *EBC, Inc. v. Clark Bldg. Systems, Inc.*, 618 F.3d 253, 265 (3d Cir. 2010). First, the party or deponent must request review of the deposition before the deposition itself is completed. *Id.*; *see* Fed. R. Civ. P. 30(e)(1). Second, the court reporter must certify that review was in fact requested. *Id.* "Without such a certification, a court cannot determine whether the threshold requirement has been satisfied." *ECB, Inc.*, 618 F.3d at 265. Once the foregoing requirements have been satisfied, the party or deponent may submit changes to the deposition within thirty days after being notified by the court reported that the transcript is available for review. *Id.* Finally, the deponent must state an adequate reason for the change. *Id.* at 266.

In this case, there is no indication on the record that Fesenmyer ever requested the right to read his deposition prior to its conclusion. The record is further muddled by the fact that the parties purported to waive the requirements of Rule 30(f)(1) (pertaining to "Certification and Delivery" of the transcript). *See* Fesenmyer Depo. at 4:2-8, ECF No. 53-9. As a result, there is no written certification from the court reporter verifying that the original transcription was accurate, nor is there any record of when the transcript was completed for purposes of commencing the 30-day correction period. Thus, the Court cannot conclude that the "clear and mandatory" requirements of Rule 30(e) have been satisfied.

Even if the procedural requirements of Rule 30(e) were satisfied, however, the Court would still have to determine the effect of the errata sheet, if any, on the deposition transcript. *See ECB, Inc.*, 618 F.3d at 267. In this circuit, courts take a "flexible" approach, recognizing that "a party may not generate from whole cloth a genuine issue of material fact (or eliminate the same) simply by re-tailoring sworn

Although Plaintiff intended to discuss his health problems with the Committee members at the September 12 meeting, he asserts that he never got the chance. DCSMF ¶59; Pl.'s Depo. at 128:9-25, 129:13-23, ECF No. 53-1. Instead, Plaintiff claims, DeMott began their meeting by inquiring whether Plaintiff had "read [his employment] contract lately," then presented Plaintiff with a proposed release of claims and stated that it was time for Plaintiff and the Authority to "go [their] separate ways." Pl.'s Depo. at 128:18-129:5. Plaintiff refused to sign the release form or tender his resignation, however. *Id.* at 129:4-5, 138:4-8. He testified that, during his brief interaction with DeMott, he was not given a chance to discuss his health concerns "or anything else" and was "literally in shell shock" as a result of DeMott's comments . *Id.* at 128:23-24, 129:19-23. At the conclusion of their meeting, the Personnel Committee determined it would recommend to the Board that the Authority terminate Plaintiff's employment. DCSMF ¶61.

---

deposition testimony to his or her satisfaction." *Id.* at 267-68. At the summary judgment stage, a district court may "refuse[ ] to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification." *Id.* at 268. On the other hand, "courts may, in their discretion, choose to allow contradictory changes (and implement [appropriate remedial measures]) as the circumstances may warrant. *Id.*

Here, Fesenmyer's errata statement constitutes a material, substantive change to his original testimony to the extent it casts doubt on his prior assertion that members of the Personnel Committee were informed about Plaintiff's health problems during the same meeting at which they decided to recommend his termination. The corrected testimony is material – even central – to the matters in dispute, because it relates to the subjective intent of individuals who were influential in Plaintiff's discharge. Fesenmyer's only explanation for the change is that he reflected further and concluded that he likely learned about Plaintiff's health issues at a much later time, during PHRC proceedings. *See* ECF No. 59-1 at 4. In this Court's view, this somewhat self-serving explanation is insufficient to permit a wholesale change of Fesenmyer's original testimony. Accordingly, while Fesenmyer is free to testify at trial in accordance with his improved recollection, the Court will not disregard his original testimony for purposes of resolving the instant Rule 56 motion. At best, Fesenmyer's errata statements create an issue of fact about when he (and possibly other Committee members) were made aware of Plaintiff's health issues. Because the Court is presently required to construe the record in the light most favorable to Plaintiff, the Court will credit Fesenmyer's original testimony and assume that Committee members discussed Plaintiff's "back issues" and "stress on the job" during the September 12, 2014 meeting.

On September 17, 2014, the Authority held its regular monthly Board meeting. DCSMF ¶67. Board members DeMott, Huber, Ron Dankesreiter, Kane, Fesenmyer, Satterwhite, and Cummings were all in attendance on that date, while Freeburg and Brady were not. DCSMF ¶70-71.

The Board initially held an executive session, during which time the Personnel Committee made its recommendation that Plaintiff be discharged. DCSMF ¶¶72-73. The seven Board members in attendance voted unanimously to accept the Committee's recommendation and terminate Plaintiff's employment. DCSMF ¶78.

## II.   **Procedural Background**

Following the loss of his employment, Plaintiff commenced this litigation on May 17, 2016. His amended complaint, the operative pleading, originally asserted violations of the Americans with Disabilities Act, the Pennsylvania Human Relations Act, and the Family Medical Leave Act. ECF No. 11.

As a result of pretrial motions practice, Plaintiffs' only remaining claims are those arising under the Pennsylvania Human Relations Act (hereafter, "PHRA"), 43 Pa. C.S.A. §951, *et seq.* As set forth in Counts II, IV, and VI of the Amended Complaint, Plaintiff asserts three causes of action against the Authority: a claim that the Authority unlawfully terminated him on the basis of a disability (Count II), a claim that the Authority unlawfully retaliated against him after he requested a reasonable accommodation (Count VI), and a claim that the Authority unlawfully failed to accommodate his disabilities when they refused to hold his position open during his brief leave of absence. The issues have been sufficiently joined and the Authority's renewed motion for summary judgment is now ripe for adjudication.

# III.    **Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment must be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  When applying this standard, the court must view the record and reasonable inferences arising from it in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving to the district court the lack of evidence supporting the non-moving party's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330-31 (1986).  The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460-461 (3d Cir. 1989) (the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance -- which supports each element of his claim to defeat a properly presented motion for summary judgment).  The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, the court cannot weigh the evidence or to make credibility determinations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986).  Instead, the court is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material.  *Id.* at 249.

# IV.   Discussion

The PHRA prohibits an employer from discriminating against any employee because of a disability. *See* 43 P.S. § 951 *et seq.* In interpreting and applying the PHRA, Pennsylvania courts are guided by the federal courts' interpretations of parallel provisions in the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 et seq. *See Stultz v. Reese Bros, Inc.,* 835 A.2d 754, 759 (Pa. Super. Ct. 2003) (citing *Imler v. Hollidaysburg American Legion Ambulance Serv.,* 731 A.2d 169 (Pa. Super. Ct. 1999); *Kelly v. Drexel Univ.,* 94 F.3d 102 (3rd Cir.1996)). Because the two statutes deal with similar subject matter and are grounded on similar legislative goals, they are generally interpreted in a co-extensive manner. *See Imler,* 731 A.2d at 173.

Relevantly, the ADA prohibits an employer from discriminating against, "a qualified individual with a disability because of the disability of such individual in regard to . . . [the] discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). To establish a "disability" within the meaning of the ADA and PHRA, the Plaintiff must show that he: "(A) [has] a physical or mental impairment that substantially limits one or more of the major life activities . . . ; (B) [has] a record of such an impairment; or (C) [is/was] regarded as having such an impairment . . . ." 42 U.S.C.A. §12102(1). Major life activities include -- among other things -- sleeping, walking, standing, lifting, bending, concentrating, and working. *Id.* §12102(2). These definitions are to be "construed in favor of broad coverage . . . to the maximum extent permitted" under the ADA and PHRA. *Id.* §12102(4)(A).

Here, Plaintiff has adduced evidence that he suffered from degenerative disc disease, degenerative joint disease, a bulging disc, resulting back and neck pain, and anxiety – some or all of which substantially limited his ability to focus at work, sit for extended periods, bend, drive, and sleep. PSCMF ¶¶56-69. Giving Plaintiff the benefit of all fair inferences, a reasonable factfinder could conclude that he had a "disability" within the meaning of the ADA and PHRA. In addition, the evidence would support a finding that Plaintiff was qualified to perform the essential functions of his job, either with or without the benefit of a reasonable accommodation.

Consequently, the only question is whether Plaintiff can prove that the Authority engaged in discrimination or some other conduct that is prohibited by the PHRA.

## A. *Discriminatory Discharge*

In Count II of the Amended Complaint, Plaintiff claims that the Authority unlawfully discriminated against him by terminating him because of his disability. At the outset, the Court notes that Defendant has analyzed Count II under a "pretext" theory of discrimination, whereas Plaintiff has attempted to argue a "cat's paw" theory of discrimination. These competing approaches involve important distinctions.

When a claim is presented under a theory of pretextual discrimination, courts apply the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–803 (1973). Under this paradigm, the plaintiff must first establish a *prima facie* case of discrimination. *See Jones v. Southeastern Pa. Transp. Auth.,* 796 F.3d 323, 326 (3d Cir. 2015). If the employee makes out a prima facie claim, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* If the employer meets this burden, the employee must then prove that the employer's proffered explanation is not

true and is actually a pretext for unlawful discrimination. *Id.* At the summary judgment stage, an employee may satisfy his "stage 3" burden by coming forward with some evidence, either direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated justification for the adverse action, or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the action. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765 (citations omitted). Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (internal quotation marks and citations omitted; bracketed alteration and emphasis in the original).

By contrast, under the cat's paw –or "subordinate bias" -- theory, a plaintiff seeks to hold his employer liable for the animus of a subordinate non-decisionmaker. *See McKenna v. City of Phila.,* 649 F.3d 171, 177-78 (3d Cir. 2011). The theory "applies to both discriminatory and retaliatory animus on the part of an individual who influenced or participated in the adverse decision." *Chase v. Frontier Commc'ns. Corp.,* 361 F. Supp. 3d 423, 448 (M.D. Pa. 2019) (citing *Macknet v. Univ. of Pa.,* 738 F. App'x 52, 57 (3d Cir. 2018)). "At the summary judgment stage, a plaintiff advancing a cat's paw theory based on alleged retaliatory or discriminatory animus of a nondecisionmaker must establish that there is a genuine issue of material fact as to

(1) the animus of the subordinate, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action." *Id.* (citing *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 515 (10th Cir. 2015)). "The Supreme Court has clarified that in 'cat's paw' cases the relevant question is whether a bias-motivated action was the proximate cause of the ultimate employment action." *Smith v. Comhar, Inc.*, 722 F. App'x 314, 318 (3d Cir. 2018) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S. Ct. 1186, 1194 (2011)). Proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect.'" *Jones,* 796 F.3d at 330 (quoting *Staub,* 562 U.S. at 419).

Here, the Authority argues that Plaintiff cannot prevail under a pretext theory because he cannot make a prima facie showing that a majority of the Board members who voted in favor of his termination – specifically, Ron Dankesreiter, Kane, Satterwhite, or Cummings – knew or perceived that he was "disabled." Alternatively, the Authority argues that the Plaintiff has failed to come forward with evidence of pretext.

These arguments are misplaced in light of Plaintiff's claims of subordinate bias. In a "cat's paw" case, "[i]f the evidence is analyzed under the *McDonnell Douglass* inferential standard, the argument is not quite that the decision makers invented a pretext for termination, but rather that they acted on the basis of a false premise because the information on which they relied was tainted by [unlawful] animus." *Mason v. Se. Pa. Transp. Auth.*, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015). Again, to survive summary judgment, the Plaintiff must show the existence of a genuine issue of material fact as to (1) the bias of the subordinate, and (2) a causal relationship between the subordinate's actions and the employer's adverse decision. *Id.* (quoting

14

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th Cir. 2006)); *see Chase*, 361 F. Supp. 3d at 448.

Construing the facts of this case in the light most favorable to Plaintiff, the Court finds that there is sufficient evidence to support a cat's paw theory of liability. To begin, the record shows that members of the Personnel Committee were aware from Plaintiff September 8, 2014 email that he was seeking additional time off to address issues related to his "personal health." Plaintiff testified that this was the first and only time in 16 years that he had ever taken two weeks of vacation time back-to-back. Pl.'s Depo. at 123:19-24, ECF No. 53-1. In direct response to Plaintiff's September 8 email, DeMott advised Plaintiff that he should "contemplate his future," which could arguably imply that Plaintiff's employment would be impacted in some unspecified manner. Plaintiff testified that he personally informed Committee member Glesk, a day or two after the September 8 email exchange, that he wished to discuss his health concerns with the Personnel Committee, he was experiencing "real stress problems," and he was taking Zoloft. This disclosure allegedly prompted Glesk to reply, "You don't want to be telling people you're on that Zoloft," which could reasonably be construed as reflecting a disability-related animus, either on the part of Glesk himself or on the part of other Committee members.[5] Based on the deposition testimony of Fesenmyer, a jury could conclude that all of the members of the Personnel Committee understood Plaintiff's health issues to include back issues and job-related

---

[5] The Authority discounts the significance of Glesk's alleged comment on the ground that he was not a member of the Board of Directors and, therefore, did not vote on Plaintiff's termination during the Board's September 17 meeting. But the record shows that the Committee's decision to recommend the termination occurred during its meeting on September 12, when Glesk was present and participating in those proceedings. For present purposes, we construe all facts in Plaintiff's favor and assume that Glesk's vote influenced the Committee's decision to recommend Plaintiff's termination. Thus, because Glesk participated in the Committee's decision to make the formal recommendation of discharge, any discriminatory bias that he harbored potentially colored the decision-making process.

stress, as DeMott allegedly disclosed that information to the Committee members on September 12, 2014. Thus, a jury could find that the Personnel Committee members discussed Plaintiff's disabling conditions at the very same meeting in which they subsequently voted to recommend his termination. If the foregoing facts are construed in the light most favorable to Plaintiff, they could support a reasonable inference that one or more members of the Personnel Committee were motivated by disability-related animus when making the decision to recommend Plaintiff's termination. Although that proposition is certainly debatable on this record, Plaintiff has established the existence of a genuine issue of material fact concerning the animus of the "subordinate" body in the decision-making chain. *Chase,* 361 F. Supp. 3d at 448.

In addition, the record would support a finding that the Committee's discriminatory bias translated into actions that caused the Board to terminate Plaintiff's employment. *Chase,* 361 F. Supp. 3d at 448. Here, there is no dispute that: (i) Committee Members DeMott, Fesenmyer, and Huber adhered to the Committee's decision to recommend Plaintiff's termination during the September 17, 2014 meeting of the Authority's Board of Directors; and (ii) the seven Board members who were present for the meeting voted unanimously to adopt the HR Committee's recommendation. Plaintiff has also produced evidence that the Board of Directors agreed to terminate Plaintiff's employment based solely on the HR Committee's recommendation. *See* PCSMF ¶¶114, 145-148. Based on these facts, a jury could conclude that, but for the disability-related prejudice of the Committee members, no recommendation to terminate Plaintiff would have been made and Plaintiff would not have been discharged. Thus, Plaintiff has come forward

with evidence sufficient to show that "a bias-motivated action was the proximate cause" of his

discharge. *Smith v. Comhar, Inc.,* 722 F. App'x 314, 318 (3d Cir. 2018).[6]

To the extent the traditional *McDonnell Douglas* burden-shifting paradigm remains

relevant, the Court acknowledges that the Authority has articulated a non-discriminatory reason

for the Committee's recommendation – namely, Plaintiff's refusal to sign employee paychecks

and his poor communication with staff members. ECF No. 45 at 17. The question thus becomes

whether Plaintiff has adduced sufficient evidence to support a finding of pretext.

Here, a number of circumstances surrounding the decision-making process would permit

a jury to disbelieve the Authority's stated justification for firing Plaintiff. To begin, there are

issues of historical fact concerning the nature of Plaintiff's actions on August 28, 2014, as

Plaintiff denies making any ultimatum or otherwise speaking inappropriately to Dankesreiter and

O'Rourke. PCSMF ¶¶137-138. As for the dispute concerning Plaintiff's refusal to sign

paychecks, Plaintiff testified that: (i) he was responsible as Director for the Authority's budget

and believed he had a fiduciary responsibility to expend its funds prudently, (ii) he wanted to

defer the decision on overtime pay until after his return, when he could look into the issue further

and/or get further guidance from the Authority or its solicitor, (iii) he felt it was safer to issue

regular paychecks in the interim, and (iv) to that end, he instructed Dankesreiter to reissue the

checks without the inclusion of overtime pay and have other individuals with check-signing

---

[6] Consequently, the Court finds this case to be materially distinguishable from *Burns v. City of Columbus, Dep't of Public Safety, Div. of Police*, 91 F.3d 836 (6th Cir. 1996), which the Authority cites in support of its request for summary judgment. In *Burns*, the Sixth Circuit Court of Appeals held that the plaintiff failed to establish a viable disability discrimination claim under the Rehabilitation Act because four of the seven committee members who recommended his termination to the ultimate decisionmaker were unaware of his alleged disability. Importantly, the *Burns* court did not address the viability of the plaintiff's claim under a "cat's paw" theory of liability. As a result, the court's analysis in *Burns* is not instructive here.

17

authority sign them in Plaintiff's absence. *See* Pl.'s Depo at 112:1-114:3. Plaintiff's version of these events, if credited, tends to cast his actions in a far less egregious light; yet, according to Plaintiff, the Personnel Committee essentially conducted no investigation into his side of the story relative to the events that supposedly served as the basis for his termination. Instead, after summoning Plaintiff to a meeting, the Committee first sought Plaintiff's resignation and then agreed to recommend his discharge, all without issuing any warning or other progressive discipline relative to the alleged misconduct. The Committee undertook these actions despite the fact that Plaintiff had served as Airport Director for approximately 16 years, apparently without incident. Moreover, the Committee made its decision to recommend Plaintiff's termination just days after Plaintiff overtly made his "personal health" an issue and arranged to take (for the first, and only time) an additional week of vacation. Considering all of these circumstances in the light most favorable to Plaintiff, jurors of reason could view the Committee's proffered explanation for Plaintiff's discharge as implausible and unworthy of credence.

Another factor supporting a finding of pretext is the existence of seemingly contradictory statements that the Authority made, through its agents, concerning the nature and circumstances of Plaintiff's discharge. In an article published in the Bradford Era on September 18, 2014, entitled "Frungillo terminated by airport authority," Glesk was quoted as stating that Plaintiff had "done a great job" during his tenure as Airport Director and "did everything we asked him to do." ECF No. 53-26 at 3. Glesk was further quoted as stating that Plaintiff's "departure" was "for personnel reasons," and involved no malfeasance. *Id.* at 2. One day prior, however, the Authority had sent Plaintiff a letter indicating that his employment was being terminated immediately (i.e., as of September 17, 2014), "in accordance with [his] employment agreement." ECF No. 53-24 at 2. Under the terms of Plaintiff's agreement, immediate termination signified

that he was being fired for "willful misconduct." PCSMF ¶95. Indeed, DeMott confirmed at his deposition that Plaintiff was terminated for willful misconduct, under the terms of his employment contract. PCSMF ¶103. On the other hand, during the course of Plaintiff's unemployment compensation proceedings, the Authority (through its attorney) took the position that Plaintiff was *not* being terminated for cause. PCSMF ¶98. Moreover, the Authority's responses to the "Employer Questionnaire" can be interpreted as suggesting that Plaintiff was not terminated as the result of an "incident." *See* PCSMF ¶99. And, during the course of the unemployment compensation proceedings, the Authority issued a second termination letter (again dated September 17, 2014) stating that Plaintiff's employment would be terminated "30 days from today on October 17, 2014." ECF No. 53-25. Under the terms of Plaintiff's employment contract, thirty-days' written notice is required when the termination is *not* for cause. See PCSMF ¶95. Given these apparently contradictory statements, jurists of reason could permissibly infer that the Authority's stated reasons for Plaintiff's discharge are untrue.

In sum, Plaintiff has adduced adequate evidence to raise a genuinely disputed issue of fact as to whether the Authority's explanation for firing Plaintiff were a pretext for disability-related discrimination. Because the Court cannot resolve these issues at the summary judgment stage, Defendant's motion must be denied relative to Count II of the Amended Complaint.

### B. Retaliation

Plaintiff claims in Count IV of the Amended Complaint that the Authority unlawfully retaliated against him by terminating him after he requested reasonable accommodations for his disabilities. Under the PHRA, employers may not discriminate against employees who engage in protected conduct. *See* 43 P.S. § 955(d); *see also* 42 U.S.C. §12203(a) (prohibiting retaliation

against an individual who has engaged in conduct protected under the ADA). Like substantive discrimination claims, ADA and PHRA retaliation claims are often analyzed under the *McDonnell Douglas* burden-shifting framework, discussed above. *See Marra v. Phila. House. Auth.,* 497 F.3d 286, 300 (3d Cir. 2007); *Gonzales v. Purolite Corp.*, No. CV 17-2983, 2019 WL 4277456, at *5 (E.D. Pa. Sept. 10, 2019). To establish a prima-facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse action either after or contemporaneous with his engagement in the protected activity; and (3) there is a causal connection between the protected activity and the employer's adverse action. *arra,* 497 F.3d at 300; *Gonzales,* 2019 WL 4277456, at *6 (citing *Krouse v. Amer. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

In its motion, the Authority challenges the first and third elements of Plaintiff's prima facie retaliation claim. With respect to the first element, the Authority asserts that Plaintiff never engaged in protected activity because he never requested a "reasonable accommodation." Instead, the Authority argues, Plaintiff merely advised the Personnel Committee members that he had twenty vacation days available and would be taking a second week of vacation from September 8-12, 2014. The Court finds this argument unpersuasive.

A "reasonable accommodation" is defined as (among other things) a "[m]odification[ ] or adjustment[ ] to the work environment, or to the manner or circumstances under which the position held . . . is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]" 29 C.F.R. §1630.2(o)(1)(ii). In his deposition, Plaintiff testified that he could determine his own work schedule to a certain extent, but the Authority had set an expectation that he would work regular business hours. Pl.'s Depo. at 177:20-178:9. Plaintiff further stated that, prior to the week of September 8, 2014, he

had never in sixteen years taken two weeks of vacation back-to-back. *Id.* at 123:19-21. Given these facts, Plaintiff's second consecutive week of vacation may well have constituted a "modification" or "adjustment" to the "circumstances" under which he "customarily performed" his job. 29 C.F.R. §1630.2(o)(1)(ii). Such an inference is buttressed by the fact that Plaintiff apparently felt compelled to inform the Committee of his plan to take the additional time off, rather than just taking it. Other federal courts have found that the use of accrued sick time or vacation can constitute a reasonable accommodation. *See, e.g., Kurylo v. Parkhouse Nursing & Rehab. Ctr., LP*, No. CV 17-00004, 2017 WL 1208065, at *7 (E.D. Pa. Apr. 3, 2017) (finding that plaintiff adequately pled a retaliation claim where he requested a reasonable accommodation in the form of using his accrued sick and vacation time to cover his two-week medical absence, then suffered adverse action allegedly as a result of taking the accommodation). Here too, Plaintiff's use of extra vacation time could reasonably be viewed as "protected activity" in the form of a "reasonable accommodation."

Alternatively, the evidence would support a finding that Plaintiff engaged in protected activity by attempting to initiate an "interactive process" with the Authority concerning his need for reasonable accommodations. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (an employer's duty to provide reasonable accommodations includes "reasonable efforts to assist the employee and to communicate with the employee in good faith," through what has come to be known as the "interactive process") (internal quotations omitted). The "interactive process" contemplates an "informal" exchange in which employers and employees work together to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. §1630.2(o)(3). The process begins when the employee gives notice of the disability to the employer and makes a request for

21

accommodation. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999). There are no formal requirements for the employee's request -- it need not be in writing, or "invoke the magic words 'reasonable accommodation.'" *Id.* Instead, courts examine the content of the employee's request to ensure that it "make[s] clear that the employee wants assistance for his or her disability," such that "the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.*

Here, a factfinder could reasonably construe Plaintiff's September 8, 2014 email and his communication with Glesk as attempts to trigger an interactive process. Plaintiff testified in his deposition that the stress he was experiencing from his job was contributing to his back problems, and he felt that he needed additional support because he was functioning as a "one-man show" and "running the entire operation." Pl.'s Depo. at 118:22-121:16. His September 8, 2014 email communicated to the Personnel Committee that he believed he needed additional time off from work for his "personal health." The email also alluded to "personnel and support issues" that he wanted to discuss with the Committee because he could not "simply continue as is." DCSMF ¶44. In his subsequent conversation with Glesk on September 8 or 9, Plaintiff indicated that he wanted to discuss his health concerns with the Personnel Committee at the upcoming meeting. Pl.'s Depo. at 131:7-9. A reasonable factfinder could interpret these communications as an attempt by Plaintiff to place the Authority on notice of his need for an accommodation. Viewed in this light, the evidence establishes that Plaintiff engaged in statutorily protected conduct.

The Authority next argues that Plaintiff cannot establish a causal connection between the protected activity and his eventual termination. Again, the Court disagrees. Courts consider a "broad array of evidence" in determining whether a sufficient causal link exists to survive a

motion for summary judgment. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (Title VII case) (internal quotation marks and citation omitted). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *Id.* (citing *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (temporal proximity alone, when "very close," can in some instances establish a prima facie case of retaliation); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (reversing summary judgment in favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim)). In the absence of "unusually suggestive" temporal proximity, court consider whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.* (internal quotation marks and citation omitted). "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.* at 232-33.

In this case, there is an unusually suggestive temporal proximity between Plaintiff's protected activity and the allegedly retaliatory conduct. Plaintiff's September 8 email – referencing his need for time off for "personal health" -- occurred just four days before the Committee's meeting wherein the decision was made to recommend Plaintiff's termination. The Committee formally rendered its recommendation (and the full Board of Directors accepted the recommendation) just nine days after Plaintiff sent his September 8 email. A similarly close temporal proximity exists between Plaintiff's statement to Glesk and the Committee's adverse recommendation. The timing of these events is sufficient to support an inference that Plaintiff's use of extra vacation time and arguable attempts to initiate an interactive process were

23

motivating factors in the Committee's decision to recommend his termination. The Authority insists that any finding of causation is precluded by the undisputed fact that four Board members were unaware of Plaintiff's alleged disability at the time they voted to fire him. But for the reasons previously explained, Plaintiff has adduced sufficient evidence to support a "cat's paw" theory of liability. Because all four members of the Personnel Committee were aware of Plaintiff's alleged "protected activity" at the time they decided to recommend his removal, a jury could permissibly infer – based on the timing of their decision – that the Committee members' actions were motivated by retaliatory animus.

Finally, the Authority contends that Plaintiff cannot prove its stated reasons for the termination decision were pretextual. The Court will not repeat its prior analysis at length but will simply note that, for the reasons previously discussed, Plaintiff has adduced sufficient evidence to establish a genuine issue of material fact relative to pretext. Accordingly, The Authority's motion for summary judgment must be denied with respect to Plaintiff's PHRA retaliation claim.

### C. Failure to Accommodate

In Count VI of the Amended Complaint Plaintiff claims that the Authority violated the PHRA when it failed to accommodate his disabilities by refusing to hold his position open during a brief leave of absence that he took in order to care for his health. Under the PHRA, prohibited forms of discrimination include an employer's failure to provide a reasonable accommodation for a disabled employee. *See Logsdon v. Univ. of Pittsburgh Med. Ctr.,* Case No. 17cv1634, 2018 WL 10230686, at *2 (W.D. Pa. Sept. 18, 2018) (analyzing ADA and PHRA failure-to-accommodate claims coextensively with one another).

To establish a failure-to-accommodate case, a plaintiff must establish that: "'(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated.'" *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). Here, the Authority challenges the first three elements of Plaintiff's prima facie case.

The Authority first argues that Plaintiff cannot show it was aware of his disability, since four of the seven Board members who voted to terminate him neither knew, nor perceived, him to be disabled. As previously discussed, Plaintiff is asserting a "cat's paw" theory of liability predicated on the claim that the members of the Personnel Committee were motivated by an unlawful disability-related bias when they agreed to recommended his termination to the full Board of Directors. Because Plaintiff has produced sufficient evidence at this juncture to support his theory, the Defendant's motion cannot be granted on the basis of its first challenge.

The Authority next argues that Plaintiff failed to establish the second element of his claim because he did not request any accommodations. For the reasons previously discussed, the Court disagrees and finds that Plaintiff's September 8 email and statement to Glesk constituted notice that he wanted assistance for his disability, such that the Authority's duty to engage in a good faith interactive process was triggered.

The Authority's final argument is that, even if Plaintiff can be said to have requested a reasonable accommodation, his claim fails because he received the accommodation he requested. According to Defendant, "Plaintiff has failed to present any evidence or create any disputed issue of material fact that the Authority did not hold his position open during his vacation." ECF No. 45 at 23. In other words, the Authority argues that Plaintiff plainly received his accommodation

25

because the Board did not vote to terminate him until two days after he had planned to return from his extended vacation. Again, the argument is not persuasive.

A "reasonable accommodation" is one that enables an otherwise qualified individual *to perform the essential functions of his job*. 29 C.F.R. §1630.2(o)(1)(ii). To the extent that Plaintiff was terminated as a result of his need for an extended period of leave or vacation, he was not "reasonably accommodated" in any meaningful sense, because the extra time off did not ultimately enable him to perform the essential functions of his job.

Alternatively, as previously discussed, Plaintiff's September 8, 2014 email and his subsequent conversation with Glesk could reasonably be construed as communications that put the Authority on notice that Plaintiff was requesting assistance with his disability. Despite these communications, Plaintiff testified that he never got the chance to discuss his health issues at the September 12 meeting with the Committee, because DeMott presented him with a release and brought up the issue of his separation before he could do so. Pl.'s Depo. at 129:29-23. A reasonable factfinder could interpret these events as a failure on the Authority's part to engage in good faith in an interactive process with Plaintiff. Consequently, Plaintiff has adduced sufficient evidence in the record to create a genuine issue of material dispute about whether the Authority failed to reasonably accommodate his disability.

## V.     Conclusion

Based upon the foregoing reasons, Defendant's renewed motion for summary judgment will be denied with respect to Plaintiff's claims against the Airport Authority.

An appropriate Order follows.

Susan Paradise Baxter
United States District Judge